James C. Shah
Natalie Finkelman Bennett
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
475 White Horse Pike
Collingswood, NJ 08107-1909
Telephone: (856) 858-1770
Facsimile: (866) 300-7367
jshah@sfmslaw.com
nfinekelman@sfmslaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LOUISE LIVINGSTON, MELISSA RAINEY, DAVID SMITH, RAYMOND SABBATINE, PETER GOLDIS and BILL COLBERT, on behalf of themselves and all others similarly situated,<br><br>           Plaintiffs,<br><br>    v.<br><br>TRANE INC.,<br><br>           Defendant. | Civ. A. No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

Plaintiffs, Louise Livingston, Melissa Rainey, David Smith, Raymond Sabbatine, Peter Goldis, and Bill Colbert (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, for their Class Action Complaint against Defendant Trane Inc. ("Trane" or "Defendant"), allege the following based on personal knowledge as to themselves and their own acts, and information and belief as to all other matters based upon, *inter alia*, the investigation of counsel, which included an analysis of Plaintiffs' documentation, industry repair bulletins, Trane's public statements, publicly available filings in related cases, and other publicly available information.

## INTRODUCTION AND NATURE OF THE ACTION

1.      This lawsuit seeks to recover damages sustained by consumers and contractors arising from a manufacturing defect that has caused widespread failures of Thermal Expansion Valves ("TXV(s)") in air conditioners and heat pumps ("HVAC systems") manufactured by Defendant.  The defect arises from a chemical rust inhibitor, called Ryconox, used by one of Trane's suppliers, Emerson Climate Technologies ("Emerson"), on compressor motors from mid-2013 through at least late 2014.  The rust inhibitor is incompatible with the oil and/or refrigerants used in the HVAC systems and creates a sticky substance that collects on the TXV, leading to degraded performance and, often, acute failure of the HVAC systems.

2.      Trane discovered the defect by the early summer of 2014 (and likely much earlier) and quickly determined that the root cause was the rust inhibitor.  Despite knowing about this defect, however, Defendant continued to sell HVAC systems containing the rust inhibitor without disclosing it so that Trane could offload its inventory of affected HVAC systems onto unsuspecting consumers.  Even after Trane admitted the existence of the manufacturing defect in dealer service bulletins in 2014, Defendant never pulled the affected systems from the shelves of distributors.  At the same time, however, the dealer service bulletins were not distributed publicly, and consumers were never informed of this known defect.

3.      Plaintiffs believe that thousands of Trane systems failed within months or just a few years of purchase due to this undisclosed defect, and tens of thousands of the systems contain the defect, which will impact their performance and value for years to come.  Moreover, despite the fact that Trane knowingly sold these defective systems, Trane's limited warranty does not cover labor or other incidental costs associated with necessary repairs.  By failing to disclose the

existence of this known defect, and refusing to cover the full costs of labor, Trane has unfairly foisted significant repair costs onto consumers.

4.      Moreover, Trane has refused to provide adequate repairs as required by its own warranty. Rather than replace the contaminated oil, clogged TXVs, and other parts, as required by its warranty, Trane has been instructing service personnel to inject the defective systems with yet another chemical, called MJ-X. As discussed herein, MJ-X is highly acidic, it dissolves metal components, it causes premature wear, and it damages and devalues the HVAC systems.

5.      Even where the contamination has not yet resulted in a complete TXV or system failure, this known defect is likely to cause a failure at some point in the future. Further, even a partial TXV clog can significantly impair the performance and efficiency of an HVAC system. Thus, many owners of the defective units are likely experiencing degraded performance even if they have not yet experienced an acute failure. This contamination should never have been present, or, at minimum, should have been disclosed.

6.      Plaintiffs seek relief on behalf of themselves and a class of similarly situated persons to remedy Trane's violations of state consumer protection laws, common law, the Magnusson-Moss Warranty Act ("MMWA"), and for breach of contract for failure to provide adequate repairs, as required by warranty. Plaintiffs seek to require Trane to, *inter alia*, fully compensate consumers for their out-of-pocket costs resulting from the defective HVAC systems, reimburse the difference between the price paid for the defective systems and the true value due to the undisclosed defect, remove the chemical contaminants (including MJ-X) from the affected systems and/or replace, at its expense, the defective HVAC systems, and/or provide an extended warranty to cover TXV or related failures (such as failures resulting from the addition of MJ-X) that may occur in the future.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States, and pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) because at least one plaintiff and Defendant are citizens of different states.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) because Trane maintains manufacturing plants and executive offices within this district.

## ADDITIONAL FACTS

### HVAC Systems' Air Cooling Process

9.     The basic principle by which an air conditioner works is Gay-Lussac's Law, which essentially states that the temperature of a gas rises as pressure increases, and then falls as pressure decreases.

10.     An HVAC system utilizes three primary components: a **compressor** that is driven by an electric motor which compresses the refrigerant, causing its temperature to increase; a **condenser coil** typically located outside the building, where a fan blows air over the hot refrigerant to reduce its temperature; and an **evaporator coil** typically located inside the building, where the pressure on the refrigerant is released, causing it to cool significantly, and over which another fan blows indoor air.



**Central Air-Conditioning & Heating System**
Graphic courtesy: Air-Conditioning & Refrigeration Institute

11.    The refrigerant arrives at the compressor as a cool, low-pressure gas.  The compressor squeezes the refrigerant, causing its molecules to be closer together, and the temperature to rise.  The compressed, hot refrigerant is then circulated through the outdoor condenser coil, where a fan blows air over the condenser coil.  Even though the outdoor temperature may be high, the temperature of the refrigerant is higher, so blowing air over it removes heat from the refrigerant in the outdoor unit.  The condensers' fins act like a radiator to quickly dissipate the heat.   As the refrigerant leaves the condenser, its temperature is much cooler and it has changed from a gas to a liquid under pressure.

12.    When it arrives at the evaporator coil inside the building, the pressure of the refrigerant is released, and as the liquid changes to gas and evaporates, its temperature drops significantly.  This cold refrigerant is circulated through the evaporator, which also has metal fins to facilitate the exchange of thermal energy with the surrounding air.  A large fan circulates air over these fins to be cooled and then throughout the interior of the building.  When the refrigerant

leaves the evaporator, it is returned to a cool, low pressure gas to cycle back through the compressor to repeat the process. This process continues until the building reaches the desired temperature.

13.     In addition to refrigerant, an HVAC system requires oil to maintain lubrication of the compressor. During operation, oil is circulated through the compressor and over the compressor motor, and a portion of this oil mixes with the refrigerant and circulates throughout the entire HVAC system, eventually returning to the compressor. Due to the careful balancing of chemical and physical properties of the refrigerant and oil, which mix together, nothing other than oil and refrigerant should typically be circulating through an HVAC system. The addition of any additives will usually void a manufacturer's warranty.

14.     A heat pump is an air conditioner that can also run in reverse, heating the interior of the building in winter and cooling it in summer. A heat pump contains a reversing valve that lets it switch between "air conditioner" and "heater." The valve allows the condenser (hot coil) and evaporator (cold coil) to reverse places in the winter. In the cooling mode, the valve slides to a position that permits the hot refrigerant gas from the compressor to flow through the top port to the bottom port to the water coil. Thus, the heat pump functions like an air conditioner. This diagram illustrates the process:



Source: "How Ground/Water Source Heat Pumps Work," Steve Kavanaugh, Professor Emeritus of Mechanical Engineering, University of Alabama.

**<u>Refrigerant and Oil</u>**

15.    For more than four decades, R-22 was the refrigerant of choice for HVAC systems. Unfortunately R-22 is a greenhouse gas and depletes ozone, and the manufacture of R-22 results in a by-product that contributes significantly to global warming.  As a result of efficiency and environmental regulations, in recent years, a new refrigerant, R-410A, supplanted R-22, which is no longer permitted in HVAC systems manufactured after January 1, 2010.

16.    The transition to 410A refrigerant had a number of effects on HVAC design.  Just as an example, 410A is more efficient and operates under higher pressure, which means that compressors and certain other components were re-designed to accommodate these higher pressures.

17.    Of particular relevance here, the adoption of 410A refrigerant required the use of synthetic oil to lubricate the compressor.  HVAC equipment that utilized R-22 typically relied on mineral oil to lubricate compressors. 410A refrigerant is incompatible with mineral oil, so,

beginning in 2010 when 410A refrigerant supplanted R-22, most manufacturers, including Defendant, began using synthetic oil, called Polyolester ("POE") oil.

18.     POE oil has several benefits over mineral oil.  For example, it allows the oil and refrigerant to mix well (called "miscibility"), so the compressor is well-lubricated.

19.     Critically, however, POE oil requires significant, additional care in manufacturing to ensure that no physical or chemical contaminants remain as a result of manufacturing processes.  For example, POE oil is more hygroscopic than mineral oil, meaning it absorbs moisture.  When POE oils are exposed to moisture and heat, they may react, forming acid that is harmful to the system.

20.     POE oils are also solvents.  This means that extra care must be taken in the manufacturing processes of HVAC equipment to ensure that the system is free of impurities or contaminants, which can include chemical, as well as physical contaminants that might react with the POE oil.

21.     Manufacturers have also known for many years that manufacturing process chemicals, such as rust inhibitors, can react with POE oil leading to TXV clogs, among other problems.

22.     The qualities of POE oil have been well-known to HVAC manufacturers since they began using POE oil, and manufacturers also knew that extra care was required during manufacturing to ensure that no contaminants remain in the equipment that could react with POE oil or 410A refrigerant.

**TXV Valves**

23.     The need to ensure that HVAC manufacturing processes do not leave incompatible contaminants is further amplified by another recent development in HVAC equipment manufacturing; namely, the use of TXVs.

24.     As explained above, the process by which air conditioners work involves releasing the pressure on the refrigerant, which causes the temperature of the refrigerant to drop. The valve that accomplishes this pressure change is therefore critical to the functioning of the HVAC system.

25.     Prior to 2006, many manufacturers used fixed-orifice valves, which are either fully open or fully closed.  In 2006, new regulations took effect that required HVAC equipment to meet certain minimum efficiency standards.  As a result of those standards, beginning in 2006 most HVAC manufacturers began using TXVs.   TXVs are precision valves designed to regulate the rate of refrigerant-liquid flow.  Unlike fixed orifice valves, a TXV meters the refrigerant's flow rate in proportion to the rate of evaporation of the refrigerant in the evaporator.  This means TXVs are much more efficient.  It also means that TXVs are more sensitive and can fail if there is contamination in the system.

26.     The TXV is by nature a bottleneck.  It typically operates by using a movable valve pin to precisely control the flow of liquid refrigerant.  Any contaminants or impurities that may be flowing through the system are likely to collect around the TXV pin.  Therefore, it is imperative to remove impurities and contaminants during manufacturing.   If such contaminants collect on the TXV it may operate inefficiently, or the system may cease to function altogether.  With the use of R-410A and POE oils, in conjunction with TXVs, it is imperative to ensure no physical or chemical contaminants are circulated within the system that could clog the TXV or cause the pin

to stick.  Manufactures, including Trane, have known for many years that manufacturing process chemicals, such as rust inhibitors, can react with POE oil and clog TXVs.

**Trane Equipment Is Plagued by Sticking TXVs Due to Defect**

27.    Trane, like many other manufacturers, purchases HVAC system components from sub-tier suppliers and used these components to build its HVAC systems.  Relevant here, for many of its HVAC systems, Trane purchased compressors from Emerson, called Copeland Scroll Compressors.

28.    In mid- to late-2013, Emerson began applying a new rust inhibitor, called Ryconox, to the motors used in its Copeland Scroll Compressors.  The rust inhibitor is not added for purposes of functionality of the compressor; rather, it is used to ensure that rust does not develop during shipping and storage.  Trane and Emerson both knew that it was of paramount importance to ensure that manufacturing process chemicals, like the rust inhibitor, were compatible with and do not cause reactions with the oil used in the systems, particularly since the oil washes over the compressor motor and then circulates through the system.

29.     Soon after Ryconox was added to the compressor motors, complaints began arriving from the field that HVAC systems containing Copeland Scroll compressors were failing within just weeks or months of installation due to stuck TXVs.   By June 2014, the problem had reached a crescendo and industry participants went into high gear to try to identify the precise nature of the defect.  Given that they knew TXV problems in the past had been caused by process chemicals, one of the first steps was to contact Emerson to inquire about any changes to process chemicals used by Emerson.   Early testing pointed to a chemical reaction (hydrolysis or polymerization) causing organic compounds to form a dark and sticky substance that adheres to the orifice cone of the TXV.

30.     The picture below at left shows a clean pin, spring and cap and the picture at the right shows a TXV pin, spring and cap covered in debris due to Ryconox:



Source: Virginia Air Distributors, Inc., VAST-14-006 Service Tip, 9/9/2014.

31.     Industry participants, including Trane, soon confirmed that the problem was the presence of Ryconox in the compressors, which was reacting with the POE oil and sticking to the TXV.  By no later than August 2017, Carrier, one of Trane's competitors, had submitted a "white paper" to Emerson that demonstrated "*conclusively that the root cause of the TXV contamination [was the] rust inhibitor called Ryconox*…."  Upon information and belief, Trane knew about this conclusion as well.

32.     Nevertheless, even after the precise cause of the defect was discovered, Trane continued to sell defective units without warning contractors or consumers in order to use up existing inventory in its pipeline.   Had Trane disclosed this known contaminant, consumers would not have purchased the defective HVAC systems, or would have paid substantially less given the expectation that they would require costly repairs soon after installation.

**Trane's MJ-X Additive "Fix"**

33.     Rather than replace the defective equipment -- or replace the contaminated oil, TXVs, and filters as required by its warranty -- in or around September 2014 Trane began advising service personnel to inject the systems with a chemical additive, MJ-X, to dissolve the sticky substance that was clogging TXVs.  Trane even went so far as to advise its service personnel to inject MJ-X into systems that had not yet failed.

34.     Trane's warranty states that the company provides a "limited warranty against manufacturing defects."  The warranty excludes labor costs, but covers all parts.  Of particular relevance, it has no exclusion for oil.

35.     An adequate repair of the defective HVAC systems here requires at least replacing the contaminated oil, TXV, and filters.  This is a labor intensive and expensive process, however, and in some cases may require replacing the entire compressor.  Injecting MJ-X is far simpler and cheaper than performing an adequate warranty repair.

36.     However, MJ-X is highly acidic and damages the systems.  MJ-X also does not actually remove the contamination that continues to circulate through the HVAC systems, often resulting in reoccurrence of stuck TXVs.

37.     Upon information and belief, MJ-X is either identical to, or substantially similar to, the additive known as "A/C Re-new," which is also marketed as "Zerol Ice."  In the late summer of 2014, HVAC manufacturers or Emerson, or both, determined that this highly-acidic additive could be a "quick fix" for the TXV clogs plaguing their HVAC systems.  Like most quick fixes, however, these additives are not an adequate repair and, in fact, create entirely new problems.

38.    A/C Re-New is an after-market chemical additive that was originally marketed as a way to squeeze some extra life out of HVAC equipment that is on its last legs, "particularly older systems where performance may have diminished over the years."  Indeed, ordinarily, injecting A/C Re-New into an HVAC system would void the manufacturer's warranty.

39.    Injecting A/C Re-New does *not* remove the rust inhibitor contamination.  To the contrary, adding A/C Re-New *merely adds more contamination*, none of which should be in a brand-new air conditioning system.  The chemical contamination continues to circulate through the HVAC system, posing a likelihood of future reoccurrence, while injecting acidic additives creates a host of new problems.

40.    In connection with investigating the use of this chemical additive to dissolve TXV clogs in affected systems, Emerson performed extensive tests of the additive.  The results of these tests showed that: (1) injecting A/C Re-New causes acidity far above generally acceptable levels; (2) A/C Re-New, and the resulting acidity, cause the copper used in pipes and coils to dissolve and deposit inside the compressor (called "copper plating"); (3) A/C Re-New dissolves lead used in the compressor bearings; (4) A/C Re-new causes a significant increase in "hydrolysis," or chemical breakdown, of the oil in the systems; and (5) A/C Re-new causes swelling of certain non-metallic materials, such as neoprene, that are commonly used for gaskets, such as in the TXV. Emerson's testing also showed abnormal compressor wear on all tested systems that were run with A/C Re-New, as set forth below.

41.    A/C Re-New is highly acidic, and causes acidity to spike well above generally accepted levels. Acidity is measured by the Total Acid Number ("TAN") and is typically stated in terms of "mg KOH/gram," which means the number of milligrams of potassium hydroxide needed

to neutralize one gram of the substance being measured. The baseline acidity for POE oil is about .05 mg KOH/g.

42.     Internally, Emerson has stated that any lubricant additives should be "non-acidic and not increase the TAN significantly," because such additives can be "overly reactive and form unwanted byproducts," and because "high TAN compressor oil is typically discouraged by OEMs."

43.     Nucalgon, the manufacturer of A/C Re-New, states that for air conditioning systems, the "generally accepted maximum [TAN] is .16 mg, although some industry experts consider numbers as high as .21 marginally safe." (emphasis added).

44.     A/C Re-New, however, causes acidity to spike far above the .16 mg generally accepted maximum. In fact, in one Emerson test, A/C Re-New caused the TAN to spike from .05 to 1.8 mg KOH/g, a 3600% increase over the baseline, which is more than *ten times* higher than the generally accepted maximum and eight times higher than the level considered "marginally safe."  After Emerson performed reactivity testing, the TAN spiked even higher, to 3.55 kg KOH/g, which was 328% higher than normal POE oil after reactivity testing.

45.     Other testing showed acidity levels in systems after injection of A/C Re-New of around 1.6 mg KOH/g, which gradually declined to around .5 mg KOH/g due to reactions with metal surfaces.  Even after reacting with the metal in the system, the acidity was still more than double the generally accepted maximum.

46.     In addition to (and likely because of) its high acidity, A/C Re-New has significant negative effects on the air conditioning systems into which it is injected.

47.     For example, A/C Re-New dissolves lead used in the compressor bearings. Emerson's testing showed that A/C Re-New resulted in a 540% increase in dissolved lead (60ppm

vs 325 ppm).  The compressors utilize leaded bronze bearings, and these are attacked by the A/C Re-New.

48.    A/C Re-New also dissolves copper.  Copper tubing is used in much of the affected air conditioning system, including the coils and line sets (*i.e.*, the pipes connecting indoor and outdoor units).  Dissolving of the copper weakens these components and can lead to refrigerant leakage.

49.    When copper is dissolved from these components, it can become redeposited on non-copper surfaces, which is called "copper plating," particularly in the compressor. Emerson's testing showed that A/C Re-New caused significant dissolved copper and also copper plating of the compressors.

50.    Emerson also found that A/C Re-New resulted in an 8% increase in hydrolysis of the oil.  Hydrolysis is a breakdown of the POE oil which increases acidity of the oil, and degrades the performance of the oil, leading to compressor wear.

51.    Emerson also found that A/C Re-New causes swelling of certain nonmetallic materials, such as neoprene, that are commonly used for gaskets, such as in the TXV.

52.    It is impossible to see the damage caused by A/C Re-New without conducting a tear down of the system and measuring wear against known parameters. Thus, it is not possible to *see* the damage caused by A/C Re-New to any individual Plaintiff's system without essentially destroying the system.

53.    Emerson, however, conducted exactly this type of "tear down" testing on eight systems injected with A/C Re-New, and every single one of them reflected damage.

54.    As summarized by Emerson's engineer, the tested compressors showed: (a) abnormal drive bearing wear; (b) abnormal bronze exposure from wear; (c) abnormal scroll tip

wear (the scroll is the portion of the compressor that actually compresses the refrigerant); (d) "heavy wear" on several lower bearings; and (e) "badly" discolored oil.

55.     Moreover, all of the units showed copper plating -- sometimes "heavy copper plating" -- from dissolved copper.

56.     In short, Emerson's testing confirmed that the acidity from this additive causes degradation of the oil and dissolution of metal, leading to abnormal wear of compressor components.

57.     Notwithstanding all of these known, negative effects, Trane instructed service personnel to inject this additive because it was cheaper than performing a real fix as required by the warranty.  At the same time, Trane never disclosed the negative effects the additive would have to either service personnel or consumers.

**Compressors Treated With A/C Re-New Do Not Pass Without Objection in the Trade**

58.     Not surprisingly given the damage caused by this additive, HVAC systems containing Ryconox and subsequently injected with the additive do not pass without objection in the trade.

59.     As noted above, despite discovering the defect by no later than mid-summer 2014, Trane continued to sell affected HVAC systems without disclosing the presence of the defective contaminant.  Many manufacturers, however, returned unused compressors containing Ryconox back to Emerson.

60.     By 2015, Emerson had millions of dollars of inventory of these unused compressors containing Ryconox.  Emerson began injecting these compressors with A/C Re-New at its factory, and attempted to re-sell them back to HVAC manufacturers.  According to Emerson

documents, all but one of the seven largest manufacturers refused to accept these "remediated" compressors containing A/C Re-New.

61.    Thus, Trane cannot claim that HVAC systems containing Ryconox and/or injected with A/C Re-New pass without objection in the trade given that the vast majority of major manufacturers refuse to accept them.

## PARTIES

62.    Plaintiff, Louise Livingston ("Livingston"), is a resident of Wausau, Wisconsin. In October 2014, Livingston purchased and had installed a new Trane system. She paid $2,650 for the system and installation. In making her decision to purchase a Trane system, she researched the system and reviewed product information provided by the Trane distributor and on Trane's website. Trane did not disclose on its website, or anywhere else for that matter, that its HVAC systems contained a chemical contaminant that would cause them to cease functioning soon after installation. If it had, Livingston would not have purchased the Trane system.

63.    Livingston purchased her Trane HVAC system from Hurtis Heating & Air ("Hurtis"). Hurtis provided a one-year labor warranty, which was included in the purchase price.

64.    In July 2016, Livingston's system stopped cooling her home. Hurtis determined that the TXV was clogged, and on July 26, 2016, Hurtis replaced the TXV, line drier filter and recharged the system. Hurtis decided against injecting the system with MJ-X because it was ineffective in curing the defect and also posed long term reliability concerns. Hurtis wrote to Livingston:

> The repair called for an oil additive to be injected into the system to help clear and dissolve any debris blocking internally of the txv, **which we have seen very limited success with using.**

17

Hurtis email to Livingston, August 30, 2016 (emphasis added). Instead, Hurtis advised Livingston that replacement of the TXV, line drier filter and refrigerant is "the best possible way to ensure [her] equipment is operating correctly and efficiently for long term reliability." *Id*. Livingston paid $684 out-of-pocket for the labor required to correctly fix her defective Trane system.

65.    Plaintiff, Melissa Rainey ("Rainey"), is a resident of Whitsett, North Carolina. In August 2014, Rainey purchased and had installed, a new Trane system. She paid approximately $3,500 for the system and installation. In making her decision to purchase a Trane system, Rainey researched the system and reviewed product information provided by the distributor and on Trane's website. Trane did not disclose on its website, or anywhere else for that matter, that its HVAC systems contained a chemical contaminant that would cause them to cease functioning soon after installation. If it had, Rainey would not have purchased the Trane system.

66.    Rainey purchased her system from Kemco Heating and Air ("Kemco"). Kemco provided a one year labor warranty, which was included in the purchase price.

67.    In August 2016, Rainey's system began to fail. She contacted Kemco, which diagnosed the problem as a sticking TXV. Kemco recommended that the TXV be replaced and that, although the part was covered, the labor charge would be $650. Rainey did some online research and read numerous complaints of sticking TXVs in new Trane systems. She contacted Trane customer service, and was provided only scripted responses and denials that there was a manufacturing defect. To avoid the hefty labor charge associated with replacing a TXV, Rainey agreed to pay Kemco to inject the system with MJ-X on August 15, 2016, pursuant to Trane's General Service Bulleting. Kemco warned her that the MJ-X may not resolve the problem. She

was not told that injecting MJ-X would cause damage to her system, however. Rainey was charged $300 to have MJ-X injected.

68.      Plaintiff, David Smith ("Smith"), is a resident of Exton, Pennsylvania. In July 2014, Smith purchased and had installed a new Trane American Standard system. He paid $13,567 for the system and installation. In making his decision to purchase a Trane system, Smith researched the system and reviewed product information provided by the distributor and on Trane's website. Trane did not disclose on its website, or anywhere else for that matter, that its HVAC systems contained a chemical contaminant that would cause them to cease functioning soon after installation. If it had, Smith would not have purchased the Trane system.

69.      Smith purchased his system from Mattioni Plumbing, Heating & Cooling, Inc. ("Mattioni"). Mattioni provided a one year labor warranty, which was included in the purchase price.

70.      In August 2016, Smith's system began to fail. He contacted Mattioni, which diagnosed the problem as a sticking TXV and then injected the system with MJ-X on August 31, 2016. Mattioni charged Smith $278 to inject the system with the chemical additive, which did not correct the problem. Mattioni then recommended that the TXV and filter drier be replaced but the "[r]euse [of the] existing refrigerant." Mattioni provided an estimate of $663 for this work. Smith inquired whether Mattioni could do better on the cost to replace the TXV since the system was only two years old. Mattioni revised the estimate $400 and Smith authorized the work on September 23, 2016. To date, Smith is out-of-pocket $678 due to the Trane manufacturing defect.

71.      Plaintiff, Raymond Sabbatine ("Sabbatine"), is a resident of Shelbyville, Kentucky. In July 2014, Sabbatine purchased and had installed a new Trane heat pump. He paid

over $11,000 for the system and installation.  In making his decision to purchase a Trane system, Sabbatine researched the system and reviewed product information provided on Trane's website. He also met with a representative from Kinser & Kinser Heating & Cooling ("Kinser") and reviewed Trane product materials provided by his installer prior to installation.  Trane did not disclose on its website, or anywhere else for that matter, that its HVAC systems contained a chemical contaminant that would cause them to cease functioning soon after installation.  If it had, Sabbatine would not have purchased the Trane system.

72.    Sabbatine purchased his system through Kinser & Kinser Heating & Cooling.

73.    In February 2017, Sabbatine noticed that his system was not performing well and hired Goldey's Heating and Cooling ("Goldey's") to perform maintenance.  Goldey's discovered that the system was not functioning properly due to a partially clogged TXV.  Goldey's contacted Trane, which informed the technician that the system was within the timeframe of the Copeland rust inhibitor defect, and advised the technician to inject MJ-X.   The MJ-X failed to resolve the problem, however.  Goldey's replaced the TXV but the system still failed to function because the contaminant had also caused a reversing valve to stick.  Goldey's then replaced the reversing valve and refrigerant.  Sabbatine incurred over $2,000 to repair the defect in his system.

74.    Plaintiff, Peter Goldis ("Goldis"), is a resident of Cambridge, Massachusetts.

75.    In April 2014, Goldis purchased and had installed a new Trane split system air conditioner.  He paid over $10,000 for the system and installation through Caron Electric.  Prior to making his purchase, Goldis performed internet research, including looking at Trane's website and data sheets provided by Trane. Trane did not disclose on its website, or anywhere else for that matter, that its HVAC systems contained a chemical contaminant that would cause them to

20

cease functioning soon after installation.  If it had, Goldis would not have purchased the Trane system.

76.    During the summer of 2014, the system did not perform adequately.  Eventually, at the end of the 2014 cooling season, Caron Electric received confirmation from the distributor that there was a known problem with the TXV valve, and replaced it under warranty.

77.    During the summer of 2015, the system seemed to be struggling to cool Goldis' home, and the problem got worse again during the summer of 2016.  In 2016, Goldis contacted another company, Central Cooling & Heating, which diagnosed the problem as another stuck TXV.  Central Cooling & Heating told Goldis that it could replace the TXV for $1,800, or replace the entire coil for $2,325.  Goldis opted to replace the entire indoor coil in hope that doing so would remove the contamination that kept clogging his TXVs.  Including service calls, duct cleaning, and repairs, Goldis incurred over $2,500 in out-of-pockets costs as a result of this defect, not including extremely high electricity bills.

78.    Plaintiff, Bill Colbert ("Colbert"), is a resident of Bourbannais, Illinois.

79.    In June 2014, Colbert purchased a new Trane system which was installed by Goodberlet Heating & Cooling ("Goodberlet").  He paid over $13,000 for the system and installation.  In making his decision to purchase a Trane system, Colbert reviewed Trane brochures which were shown to him by Goodberlet.  The Trane documents did not disclose that Trane's HVAC systems contained a chemical contaminant that would cause them to cease functioning soon after installation.  If they had, Colbert would not have purchased the Trane system.

80.     In May 2017, Colbert's system stopped working due to a clogged TXV.  Colbert incurred over $150 to replace the TXV.  Trane did not replace his contaminated oil, or change any filters; thus, the contaminant is still within his system.

81.     Defendant, Trane, is a Delaware corporation.  Trane was acquired by Ireland-based Ingersoll Rand in 2008.  Prior to and after the acquisition, Trane maintained its headquarters in Piscataway, New Jersey, while also having corporate offices at Ingersoll Rand's U.S. headquarters in North Carolina.  Trane's HVAC systems are branded either Trane or American Standard (these systems herein are collectively referred to as "Trane").

82.     Trane operates through 400 locations in more than 100 countries, and "[o]ne of Trane's air conditioning units is installed every minute of every day."[1]  In selling its HVAC systems to Plaintiffs and other consumers, Trane stated that its systems are "reliable" and provide "comfort and efficiency" throughout the warmest months of the year.[2]  Trane also states that its rigorous, "extreme"  testing ensures reliability:

At the SEET lab in Tyler, Texas - which stands for Systems Extreme Environmental Test - Trane products are put through 16 weeks of bone-chilling cold and blistering heat, in repeating two-week sessions. Some units endure over 2,600 hours of continuous testing, including a full week of salt spray to monitor corrosion resistance. Our technicians have tried to break our Climatuff® compressor over 900 ways, which has produced a saying at Trane, if a product doesn't make it through our test lab it doesn't get made. By putting our heating and cooling units through 5 years worth of wear and tear in the matter of a few months, we reinforce our philosophy of making products you can rely on for years and years. It's hard to stop a Trane isn't just a tagline...it's been proven.

*See* https://www.trane.com/residential/en/why-us/reliability.html (last visited 5/1/17).

---

[1] *See* https://www.trane.com/residential/en/why-us/history.html (last visited 5/1/17).
[2] *See* https://www.trane.com/residential/en/products/heating-and-cooling/air-conditioners.html (last visited May 1, 2017).

**NOTICE TO TRANE**

83.    Plaintiffs, through their counsel, sent a demand letter to Trane via certified mail on June 15, 2017.  The letter asserted that, by virtue of Trane's conduct in selling defective HVAC systems, and by failing to adequately repair them under warranty, Trane is in breach of its implied and express warranties and violated the MMWA, as well as the common law and consumer protection laws of Plaintiffs' respective states.  Plaintiffs demanded that Trane, *inter alia*, replace all affected HVAC Systems, or all such parts (including refrigerant, oil, filters, and TXVs) as are necessary to fully remove the rust inhibitor associated with clogged TXVs and also any MJX that was injected; and reimburse Claimants and all purchasers and owners who incurred out-of-pocket costs to diagnose and repair the defective systems.  Plaintiffs requested a response within 30 days.  Trane never responded.  A copy of Plaintiffs' demand letter is attached hereto as Exhibit A.

**CLASS ACTION ALLEGATIONS**

84.    Plaintiffs bring this lawsuit, both individually and as a class action, on behalf of all similarly situated individuals, pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3).

85.    For Plaintiffs' claims under the MMWA (Count I), Plaintiffs seek to certify the following nationwide class (the "Nationwide Class"):

> **Nationwide Class**
> All persons and entities who purchased an HVAC system manufactured by Trane that includes a Copeland Scroll Compressor manufactured with Ryconox rust inhibitor, and all persons and entities that have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

86.    In addition, Plaintiffs seek to certify subclasses for their common law and state statutory claims under Wisconsin law (the "Wisconsin Sub-Class"), North Carolina law ("North

Carolina Sub-Class"), Pennsylvania law ("Pennsylvania Sub-Class"), Kentucky law ("Kentucky Sub-Class"), Massachusetts law ("Massachusetts Sub-Class), and Illinois law ("Illinois Sub-Class") (collectively with the Nationwide Class, the "Class"):

### The North Carolina Class – (represented by Melissa Rainey)

All persons and entities in North Carolina that purchased an HVAC system manufactured by Trane that includes a Copeland Scroll Compressor manufactured with Ryconox rust inhibitor, and all persons and entities that have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

### The Pennsylvania Class – (represented by David Smith)

All persons and entities in Pennsylvania that purchased an HVAC system manufactured by Trane that includes a Copeland Scroll Compressor manufactured with Ryconox rust inhibitor, and all persons and entities that have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

### The Wisconsin Class – (represented by Louise Livingston)

All persons and entities in Wisconsin that purchased an HVAC system manufactured by Trane that includes a Copeland Scroll Compressor manufactured with Ryconox rust inhibitor, and all persons and entities that have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

### The Kentucky Class – (represented by Raymond Sabbatine)

All persons and entities in Kentucky that purchased an HVAC system manufactured by Trane that includes a Copeland Scroll Compressor manufactured with Ryconox rust inhibitor, and all persons and entities that have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

**The Massachusetts Class – (represented by Peter Goldis)**

All persons and entities in Masschusetts that purchased an HVAC system manufactured by Trane that includes a Copeland Scroll Compressor manufactured with Ryconox rust inhibitor, and all persons and entities that have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

**The Illinois Class – (represented by Bill Colbert)**

All persons and entities in Illinois that purchased an HVAC system manufactured by Trane that includes a Copeland Scroll Compressor manufactured with Ryconox rust inhibitor, and all persons and entities that have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

87.    Plaintiffs may seek to certify additional subclasses, as the Court would deem appropriate.

88.    Excluded from the proposed Class are the following individuals and/or entities: the Court, all Court personnel involved in the handling of this case, as well as their immediate family members; Trane and its subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Trane has a controlling interest; all individuals who timely elect to be excluded from this proceeding using the correct protocol for opting out; and any and all federal, state or local governments, including, but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, councils and/or subdivisions.

89.    **Numerosity:**  Upon information and belief, the Class comprises thousands of natural persons throughout the United States and is so numerous that the joinder of all members of the Class is impracticable.  While the exact number of individuals and entities that purchased Trane HVAC systems can only be ascertained through discovery, the identity of Class members is readily determinable from Trane's records.

90.     **Common Questions of Law and Fact Predominate:**  There are questions of law and fact common to the Class, which predominate over any individual issues, including:

(a)    Whether and when Trane knew or should have known that its manufacturing processes were not adequate in light of the known properties of POE oil and consistent with its use of TXVs;

(b)    Whether Trane knowingly sold HVAC systems that had a high propensity to clog the TXV due to defects in manufacturing;

(c)    Whether the addition of MJ-X, which Trane has been prescribing, will have negative long-term effects or shorten the life of the HVAC systems;

(d)    Whether Trane's HVAC systems were sold with a manufacturing defect;

(e)    Whether a reasonable consumer would consider the defect or its consequences to be material;

(f)    Whether Trane concealed and/or failed to disclose the defective condition of the HVAC systems to consumers;

(g)    Whether Trane breached express and implied warranties;

(h)    Whether Trane was unjustly enriched;

(i)    Whether Trane breached consumer protection laws of the states of North Carolina, Pennsylvania and Wisconsin; and

(j)    Whether Plaintiffs and the Class have sustained monetary losses and, if so, the proper measure of those losses.

91.     **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class have been similarly affected by Defendant's common course of conduct.

92.     **Adequacy of Representation:** Plaintiffs will fairly and adequately represent and protect the interest of the Class.  Plaintiffs have retained counsel with substantial experience in handling complex class action litigation.  Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class.

93.     **Superiority of Class Action:** A class is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all class members is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by the Class is likely in the millions of dollars, the individual damages incurred by each Class member resulting from Trane's wrongful conduct are not substantial enough to warrant the expense of individual suits.  The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.  Individual members of the Class do not have significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay of the same factual and legal issues.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.  In addition, Defendant has acted on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

94.     Given that Trane engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and common law and statutory violations are involved and common questions far outweigh any potential individual questions.

95.     Plaintiffs reserve the right to revise the above class definition based on facts adduced in discovery.

**COUNT I**
**Violation of the Magnuson-Moss Warranty Act,**
**15 U.S.C. §§ 2301, *et seq.***
**(On Behalf of a Nationwide Class)**

96.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

97.     Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class and State Sub-Classes.

98.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

99.     Trane HVAC systems are "consumer products" within the meaning of the MMWA, 15 U.S.C. §2301(1).

100.    Trane is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. §2301(4)-(5).

101.    Plaintiffs are "consumers" within the meaning of the MMWA, 15 U.S.C. §2301(3), because they are persons entitled, under applicable state law, to enforce against the warrantor the obligation of its express and implied warranties.

102.    The MMWA, 15 U.S.C. §2301(d)(1), provides a claim for relief for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

103.    Trane provided Plaintiffs and Nationwide Class members with a written warranty within the meaning of the MMWA, 15 U.S.C. § 2301(6).

104.    Trane breached the warranty, as described in more detail herein, by manufacturing Trane HVAC systems that are defective in design, materials and workmanship and are likely to fail prematurely, and further by failing to adequately repair them by removing the contamination and, instead, injecting yet another contaminant which damages and devalues the HVAC systems and creates a likelihood of premature failure.

105.    As a result of Trane's breach of implied and express warranties pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs and Class members have suffered damages.

106.    Plaintiffs and Class members are entitled to recover damages as a result of Trane's breach of warranties.

107.    Plaintiffs and Class members are also entitled to seek costs and expenses, including attorneys' fees, under the MMWA, 15 U.S.C. §2301(d)(2).

## COUNT II
### Negligent Misrepresentation
**(All Plaintiffs, Individually and On Behalf Of Their Respective State Sub-Classes)**

108.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

109.    Plaintiffs bring this claim on behalf of themselves and on behalf of their respective State Sub-Classes.

110.    As a manufacturer of a product sold to consumers, Defendant has and continue to have a duty to disclose to Plaintiffs and their respective State Sub-Classes the actual quality of Defendants' HVAC systems and the defect alleged herein.

111.    Defendant negligently and/or recklessly misrepresented, omitted and concealed from Plaintiffs and their respective State Sub-Classes material facts relating to the quality of Defendant's HVAC systems and the systems' capability of performing up to their advertised SEER ratings.

112.    The misrepresentations, omissions and concealments complained of herein were negligently or recklessly made to potential purchasers and the general public on a uniform and market-wide basis.  As a direct and proximate result of these misrepresentations, omissions and concealments, Plaintiffs and the State Sub-Classes have been damaged, as alleged herein.

113.    Plaintiffs and the State Sub-Classes would not have purchased the HVAC systems had Defendant disclosed the defect, which was highly material.

114.    As alleged above, in deciding whether to spend thousands of dollars and pay a premium price for Defendant's new HVAC systems, Plaintiffs reviewed and relied upon the statements contained in Defendant's marketing and warranty materials.  Further, Defendant failed to disclose the existence of the defect in any marketing material or other publicly available disclosures.  Had Defendant disclosed the defect, Plaintiffs would not have purchased the defective systems.

115.    Based on such reliance, Plaintiffs and the State Sub-Classes purchased Defendant's HVAC systems and, as a result, suffered and will continue to suffer damages and economic loss in an amount to be proven at trial.

116.    Plaintiffs and their respective State Sub-Classes are also entitled to damages and injunctive relief as claimed below.

<u>COUNT III</u>
**Unjust Enrichment**
**(All Plaintiffs, Individually and On Behalf Of Their Respective State Sub-Classes)**

117.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

118.    Plaintiffs bring this claim on behalf of themselves and on behalf of their respective State Sub-Classes.

119.    Plaintiffs and Class members conferred a tangible economic benefit upon Trane. Class members who are contractors promote, purchase and re-sell installed Trane HVAC systems and thereby confer a direct benefit on Trane.  Likewise, Class members who are end-users purchase Trane HVAC systems and confer a direct benefit in the form of profits to Trane.  Trane has retained the benefits of these purchases under circumstances that make it inequitable for Trane to retain those benefits without paying the value thereof.  Specifically, Trane retained these benefits despite knowing the HVAC systems purchased by Plaintiffs and Class members contained a material defect which would require costly repairs that would not be fully covered by Trane's limited warranty.  If Trane had disclosed this material defect, Plaintiffs and Class members would not have purchased the defective systems, or would not have agreed to pay premium prices for the Trane HVAC systems.

120.    Plaintiffs purchased the Trane HVAC systems from Trane's agents, in part, because of Trane's advertisements, marketing, and product claims, and, as a result, a relationship between the parties has been created even though Plaintiffs did not purchase Trane HVAC systems directly from Trane.

121.    Failing to require Trane to provide remuneration under these circumstances would result in Trane being unjustly enriched at the expense of contractors.  Trane's retention of the benefit

conferred upon them by members of the Class would be unjust and inequitable and Trane should be required to pay restitution to Plaintiffs and Class members for its unjust enrichment.

**COUNT IV**
**Breach of Implied Warranty of Merchantability**
**(All Plaintiffs, Individually and On Behalf Of Their Respective State Sub-Classes)**

122.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

123.    Plaintiffs bring this claim on behalf of themselves and on behalf of their respective State Sub-Classes.

124.    Plaintiffs seek to recover for Trane's breach of implied warranty.

125.    Trane is a merchant in the sale of its HVAC systems to Plaintiffs and the Class members, and the HVAC systems are goods under applicable law.

126.    Plaintiffs and Class members are in privity with Trane in that they purchased their HVAC systems through Trane's authorized sales channel of distributors, who are Trane's actual or apparent agents.

127.    At all times relevant hereto, there was a duty imposed by law which requires that Trane's HVAC systems be reasonably fit for the purposes for which such systems are used, that they are of fair or average quality within their description, and that they be acceptable in trade for their description.

128.    Trane has not validly disclaimed, excluded or modified the implied warranties and/or duties herein, and/or any attempted disclaimer or exclusion of the same was and is ineffectual.

129.    Notwithstanding the aforementioned duty, at the time of delivery, the HVAC systems sold to Plaintiffs and Class members were not merchantable, and not fit for the ordinary

purposes for which they were sold.  The HVAC systems are not fit for the ordinary purposes of cooling interior spaces such as homes and work places because they contain contaminants that clog the TXVs, preventing the systems from running efficiently or at all.

130.    As documented in the industry-wide reports, its own General Service Bulletins and elsewhere, Trane was notified that the HVAC systems were not merchantable within a reasonable amount of time after the defect manifested itself to Plaintiffs and the Class.

131.    Further, most major manufacturers refuse to accept systems treated with A/C Re-New and similar additives, demonstrating that such systems do not pass without objection in the trade.   By injecting A/C Re-New into defective systems, Trane further violated implied warranties.

132.    As a result of the non-merchantability of the HVAC systems described herein, Plaintiffs and other members of the Class have sustained damages in an amount to be determined at trial.

## COUNT V
### Breach of Express Warranty (Contract)
### (All Plaintiffs, Individually and On Behalf Of Their Respective State Sub-Classes)

133.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

134.    Plaintiffs bring this claim on behalf of themselves and on behalf of their respective State Sub-Classes.

135.    Trane's express warranty provided with all Trane HVAC systems come with a "warranty against manufacturing defects…."  The warranty covers all parts, and has no exclusion for oil.

33

136.    Trane breached the express warranty by failing to replace contaminated oil and clogged TXVs.  Instead, Trane instructed service personnel to inject MJ-X, which causes damage and further devalues the systems, without disclosing the damage caused.   Further, by adding the foreign additive, Trane is not purging the system of the contaminants which degrade the efficiency of the systems and cause a likelihood of reoccurrence in the future. By adding the foreign additive, Defendant has not remedied the underlying defect and left the treated systems in a defective condition.

137.    Furthermore, the limited warranty is unconscionable because, despite the fact that Trane sold the systems with a known defect, Trane's warranty provides no coverage for labor costs necessary to repair the defect.  The warranty is a contract of adhesion, presented solely on a take-it or leave-it basis, which Plaintiffs and Class members have no opportunity to negotiate. Given that Trane knew about the defect at the time the systems were sold but failed to disclose it, it is unconscionable that Trane provided a warranty that does not cover the full costs of repair.

138.    Trane's warranty also fails in its essential purpose because Trane has refused to adequately repair the systems and, instead, is instructing service personnel to inject a harmful chemical that causes further damage and devalues the systems.

139.    Also, any provisions contained in Trane's express warranties that attempt to limit remedies to the exclusion of labor and other expenses incurred in repairing or replacing the defective products are unconscionable, fail to conform to the requirements for limiting remedies under applicable law, and cause Trane's express warranties to fail of their essential purpose, and are therefore void.

140.    Accordingly, recovery by Plaintiffs and the Class is not limited to the limited warranty of repair to or replacement of parts defective in materials or workmanship, and

Plaintiffs, individually and on behalf of their respective State Sub-Classes, seek all remedies as allowed by law.

141.    Trane was put on notice of these issues by numerous complaints and the industry-wide investigation - including its own investigation - concerning the TXV failures that began in mid-2013.  In addition, Plaintiffs notified Trane of their claims via the demand letter, discussed above, but Trane refused to respond.

142.    Plaintiffs and Class members have suffered direct and consequential damages as a direct and proximate result of Trane's breach of its express warranties.  Plaintiffs seek all damages permitted by law in an amount to be proven at trial.

## COUNT VI
## Fraudulent Concealment
### (All Plaintiffs, Individually and On Behalf Of Their Respective State Sub-Classes)

143.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

144.    Plaintiffs bring this claim on behalf of themselves and their respective State Sub-Classes.

145.    Plaintiffs allege that Defendant intentionally suppressed and concealed the defect, or acted with reckless disregard for the truth, and denied Plaintiffs and the State Sub-Classes information that was highly relevant to their purchase decision.

146.    Defendant further affirmatively misrepresented to Plaintiffs and the State Sub-Classes, including in standard and uniform material provided with the purchase of each HVAC system, that the systems would perform and operate properly under normal usage.

147.    Defendant knew or recklessly disregarded that these representations and omissions were false or misleading.

148.    Defendant's HVAC systems purchased by Plaintiffs and the State Sub-Classes were, in fact, defective because of the manufacturing defect alleged herein.

149.    Defendant had a duty to disclose that its HVAC systems were defective, inefficient and unreliable and essentially rendered inoperative due to the manufacturing defect, and that the limited warranty provided was grossly insufficient to repair the defect.

150.    The aforementioned concealment was material because if it had been disclosed, Plaintiffs and the State Sub-Classes would not have bought the defective HVAC systems, or would have not have bought them at the premium price paid.

151.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing a new HVAC system.  Defendant knew or recklessly disregarded that its representations were false because it knew that in order to sell its inventory of defective HVAC systems, it would need to conceal the defect and intentionally make the false statements.

152.    Plaintiffs relied on Defendant's omissions and affirmative misrepresentations about the efficiency, reliability and quality of the HVAC systems in purchasing their systems.

153.    Plaintiffs and the State Sub-Classes have been injured in an amount to be proven at trial.

154.    Defendant's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the State Sub-Classes.  Plaintiffs and the State Sub-Classes are therefore entitled to an award of punitive damages.

### COUNT VII
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act,**
**N.C. Gen. Stat. §§ 75-1.1, *et seq.***
**(On Behalf of the North Carolina Class)**

155.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

156.    Plaintiff Rainey brings this claim on behalf of herself and the North Carolina Class.

157.    The N.C. Gen. Stat. § 75-1.1 makes unlawful, "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

158.    By selling its HVAC systems throughout the State of North Carolina and making representations regarding the use and quality of its HVAC systems, Trane has affected commerce and trade within North Carolina.

159.    Trane engaged in unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1 when, in selling and advertising its HVAC systems, it failed to give Rainey and North Carolina Class members adequate warnings and notices regarding the defect in its HVAC systems despite the fact that Trane knew, or should have known, of the defect described herein.

160.    Trane engaged in unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1 when, in selling and advertising its HVAC systems, it omitted, concealed and failed to disclose that the HVAC systems had not been properly purged of all contaminants, had not been adequately tested, would not perform as represented, and would fail within weeks or months of installation.  These acts constitute aggravating circumstances.

161.    Trane's acts and omissions possessed the tendency or capacity to mislead or create the likelihood of deception to Rainey and the North Carolina Class.

162.    Trane's acts and omissions caused Rainey and the North Carolina Class to pay more for their HVAC systems than they would have had they known the systems were defective. Further, Rainey and the North Carolina Class have incurred significant out-of-pocket expenses to have their defective systems serviced.

163.    As a direct and proximate result of these unfair, deceptive and unconscionable commercial practices, Plaintiff Rainey and Class members have been damaged and are entitled pursuant to N.C. Gen. Stat. §75-16, to recover treble damages and attorneys' fees and costs.

**COUNT VIII**
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law,**
**Pa. Stat. Ann. § 201-1, *et seq.***
**(On Behalf of the Pennsylvania Class)**

164.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

165.    Plaintiff Smith brings this count on behalf of himself and the Pennsylvania Class.

166.    By failing to disclose and actively concealing the defective manufacturing process of its HVAC systems, Trane engaged in deceptive business practices prohibited by the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. § 201-1, *et seq.* ("UTPCPL"), including: (i) representing that the Trane HVAC systems have characteristics, uses, benefits, and qualities which they do not have; (ii) representing that the Trane HVAC systems are of a particular standard, quality, and grade, when they are not; (iii) advertising Trane HVAC systems with the intent not to sell them as advertised; and (iv) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

167.    Trane knew that its HVAC systems were defectively designed or manufactured, would fail without warning, and were not suitable for their intended use.  Trane nevertheless failed to warn Smith and the Pennsylvania Class members about these defects despite having a duty to do so.

168.    Trane owed Smith and the Pennsylvania Class members a duty to disclose the defective nature of the HVAC systems, because Trane:

(a)    Possessed exclusive knowledge of the defects rendering the Trane HVAC systems more unreliable than similar systems;

(b)    Intentionally concealed the defects associated with Trane HVAC systems through its deceptive "fix" to inject MJ-X that essentially hides the defects

in the HVAC system for some uncertain amount of time and its injection

into the system voids the warranty; and/or

(c)    Made incomplete representations about the characteristics and performance

of the Trane HVAC system generally, while purposefully withholding

material facts from Smith and the Pennsylvania Class members that

contradicted these representations.

169.    Trane's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Smith and the Pennsylvania Class members, about the true

performance and characteristics of the Trane HVAC systems.

170.    As a result of its violations of the UTPCPL as detailed above, Trane caused actual

damage to Smith and the Pennsylvania Class members and that, if not stopped, will continue to

harm Smith and the Pennsylvania Class members as Trane's recommended "fix" to the HVAC

systems may cause further harm to the systems.

171.    Smith and the Pennsylvania Class members sustained damages as a result of

Trane's unlawful acts and are, therefore, entitled to damages and other relief as provided under

the UTPCPL, including treble damages.

172.    Smith and the Pennsylvania Class members also seeks court costs and attorneys'

fees as a result of Trane's violation of the UTPCPL as provided in Pa. Stat. Ann. § 201-9.2.

## COUNT IX
### Violations of the Wisconsin Deceptive Trade Practices Act
### Wis. Stat. §§ 100.18, *et seq.* ("WDPTA")
### (On Behalf of the Wisconsin Class)

173.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth

herein.

174.    Livingston brings this claim on behalf of herself and the Wisconsin Class.

39

175.    The WDPTA, §100.18(1) states, in relevant part:

No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, . . . shall make, publish, disseminate, circulate, or place before the public, . . . in this state, . . . an advertisement, announcement, statement or representation of any kind to the public relating to such . . . sale . . . of such real estate, merchandise, securities, service or employment . . . , which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

176.    Trane's conduct as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, its manufacture and sale of HVAC systems with a manufacturing defect, which Trane failed to adequately investigate, disclose and remedy. Further, Trane knew about of the defect prior to the sale of the Trane HVAC systems but did not disclose its existence to Livingston and the Wisconsin Class.

177.    Trane supplied false information regarding the efficiency, performance, reliability and warranty terms of its HVAC systems.

178.    Trane's untrue, deceptive, and misleading assertions, representations, and statements of fact concerning the qualities, nature, and characteristics of its HVAC systems materially induced Livingston and other members of the Wisconsin Class to pay more than they otherwise would have.

179.    Trane had a duty to disclose to Livingston and members of the Wisconsin Class the defect in its HVAC systems, as the facts were material to Livingston's and the Wisconsin Class members' transactions; because Trane made contrary representations and statements; because Trane as the party with knowledge of the defect, knew that Livingston and members of

the Wisconsin Class were entering transactions under a mistake as to the fact of the defective design of the HVAC systems; because the fact of the defective nature of the design was peculiarly and exclusively within Trane's knowledge and the mistaken parties, Livingston and Wisconsin Class members, could not reasonably be expected to discover it; and on account of the objective circumstances, Livingston and the members of the Wisconsin Class reasonably expected disclosure of the fact of the defect.

180.    Livingston and Wisconsin Class members have been injured as a result of Trane's conduct.  Due to Trane's deceptive or unfair conduct, Livingston and the Wisconsin Class overpaid for their HVAC systems and did not receive the benefit of the bargain.

181.    Trane's conduct proximately caused the injuries to Livingston and the Wisconsin Class members and they are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

### COUNT X
**Violations of the Illinois Consumer Fraud Act
815 ILCS 505/1, *et seq.* ("Illinois CFA")
(On Behalf of the Illinois Class)**

182.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

183.    Plaintiff Colbert brings this claim on behalf of himself and the Illinois Class.

184.    The Illinois CFA, like the consumer fraud acts of numerous other states across the nation, prohibits deceptive acts and practices in the sale of such products as Trane's HVAC systems.

185.    At all relevant times, Trane engaged in unfair, false, misleading, and deceptive acts and practices by, *inter alia*, manufacturing and selling HVAC systems with a manufacturing defect and falsely representing, by means of its advertising and marketing, the efficiency,

performance, reliability, and warranty terms of its HVAC systems to Colbert and the Illinois Class.  All of these facts were material to the purchasing decisions of Colbert and the Illinois Class.

186.    Moreover, because Trane's warranties are limited in duration, consumers were further entitled to know what failures might not exhibit themselves until the warranties expired and, if that occurred, Trane was not committing to repair the condition.  All these facts were material to consumers' (such as Colbert and the Illinois Class) purchase decisions.

187.    Trane's conduct alleged herein is furthermore unfair insofar as it offends public policy; it is oppressive in that the consumer has little alternative but to submit; and it causes consumers substantial injury.

188.    Trane intended that Colbert and the Illinois Class members would rely on its deceptive acts.

189.    Plaintiff Colbert and the Illinois Class were injured by Trane's deceptive misrepresentations, concealments, and omissions, and these misrepresentations, concealments, and omissions were material and deceived Colbert and the Illinois Class.

190.    Trane's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.  Trane does business in Illinois, sells and distributes its HVAC systems in Illinois, and engaged in deceptive acts and practices in connection with the sale of its HVAC systems in Illinois and elsewhere in the United States.

191.    The HVAC systems purchased by Colbert and the Illinois Class members were "consumer items" as that term is defined under the Illinois CFA.

192.    Trane's deceptive acts proximately caused actual injury and damage to Colbert and the Illinois Class.

193.    Trane's conduct constituted consumer fraud under the Illinois CFA.

## COUNT XI
### Violations of Massachusetts' Regulation of Business Practices
### for Consumer Protection
### Mass. Gen. Laws, Chapter 93A, *et seq.* ("Mass. GLC")
### (On Behalf of the Massachusetts Class)

194.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

195.    Goldis brings this claim on behalf of himself and the Massachusetts Class.

196.    In accordance with Mass. GLC 93A, § 9(3), on June 15, 2017, a written demand for relief was made on Trane on behalf of Goldis and the Massachusetts Class.

197.    Trane did not make a reasonable offer of relief to the Massachusetts Class.

198.    Mass. GLC 93A § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Mass. GLC 93A § 9 permits any consumer injured by a violation of Mass. GLC 93A § 2 to bring a civil action, including a class action, for damages and injunctive relief.

199.    Trane engaged in unfair and deceptive acts and/or practices in the conduct of trade or commerce in violation of Mass. GLC 93A § 2.

200.    Trane's unfair and deceptive scheme to mislead consumers was comprised of countless unfair and deceptive acts or practices, including, but not limited to, manufacture and sale of HVAC systems with a manufacturing defect and uniformly representing to Goldis and the Massachusetts Class, by means of its advertising and marketing, false information regarding the efficiency, performance, reliability, and warranty terms of its HVAC systems.  These unfair and deceptive acts and practices have a capacity, tendency, and/or likelihood to deceive or mislead reasonable consumers.

201.    Trane's conduct, as alleged herein, violates various regulations promulgated by the Massachusetts Attorney General pursuant to c. 93A, § 2(c), including the following:

- 940 C.M.R. § 3.02 (prohibiting, among other things, statements or illustrations used in advertisements which create a false impression of the grade, quality, value, or usability of the product offered);

- 940 C.M.R.§ 3.05(1) (prohibiting claims or representations "made by any means concerning a product which, directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect");

- 940 C.M.R. §3.05(2) (prohibiting the use of any advertisement "which would mislead or tend to mislead buyers or prospective buyers, through pictorial representations or in any other manner, as to the product being offered for sale");

- 940 C.M.R. § 3.08(2) (providing that it "shall be an unfair and deceptive act or practice to fail to perform or fulfill any promises or obligations arising under a warranty");

- 940 C.M.R. § 3.16(2) (providing that it is a violation of c. 93A, § 2 to "fail to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer to enter into the transaction"); and

- 940 C.M.R. § 3.16(3) (providing that an act or practice violates c. 93A, § 2 if it "fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide consumers of this Commonwealth protection").

202.    Trane's violations of Mass. GLC 93A were willful and knowing.

203.    As a direct and proximate result of Trane's unfair and deceptive acts, Goldis and the Massachusetts Class were injured and suffered damages and are entitled to actual or statutory damages, treble damages, attorneys' fees and costs.  The injuries suffered by Goldis and the Massachusetts Class include, but are not limited to, paying a premium price for Trane's falsely advertised HVAC systems, and by the unlawful profits Trane earned from the sales of these falsely advertised products.

204.    Pursuant to Mass. GLC 93A, § 9, Goldis, and each of the other members of the Massachusetts Class are entitled to recover statutory damages or actual damages, including recovery of double or treble the amount of their actual damages, plus reasonable attorneys' fees and the costs of the action.

205.    Goldis and the other members of the Massachusetts Class are also entitled to injunctive relief in the form of an order directing Trane to cease its deceptive practices.

**COUNT XII**
**Violations of the Kentucky Consumer Protection Act**
**Ky. Rev. Stat. § 367.110 to 367.330 ("Ky. Rev. Stat.")**
**(On Behalf of the Kentucky Class)**

206.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

207.    Sabbatine brings this claim on behalf of himself and the Kentucky Class.

208.    The Kentucky CPA declares unlawful, *inter alia*, "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," where "unfair should be construed to mean unconscionable."  Ky. Rev. Stat. § 367.220.

209.    Trane, Sabbatine, and the members of the Kentucky Class are persons within the meaning of Ky. Rev. Stat. § 367.110(1).  Trane's business activities involve trade and/or commerce pursuant to Ky. Rev. Stat. § 367.110(2), as they are addressed to the market generally and otherwise implicate consumer protection concerns.

210.    At all relevant times, Trane engaged in unfair, false, misleading, and deceptive acts and practices by, *inter alia*, manufacturing and selling HVAC systems with a manufacturing defect and falsely representing, by means of its advertising and marketing, the efficiency, performance, reliability, and warranty terms of its HVAC systems to Sabbatine and the Kentucky

Class.  All of these facts were material to the purchasing decisions of Sabbatine and the Kentucky Class.

211.     Trane intended that Plaintiff Sabbatine and the Kentucky Class rely on its unfair, false, misleading and deceptive acts and practices when Sabbatine and the Kentucky Class were purchasing the HVAC systems, unaware of the material facts regarding the HVAC systems' defect described above.  This conduct constitutes consumer fraud within the meaning of the Ky. Rev. Stat.

212.     Trane has committed deceptive acts or practices within the meaning of the Ky. Rev. Stat. by engaging in the acts and practices alleged herein, including, but not limited to, its failure to disclose the material defect.

213.     Trane's conduct alleged herein is furthermore unfair insofar as it offends public policy; is so oppressive that the consumer has little alternative but to submit; and causes consumers substantial injury.

214.     As a direct and proximate result of the unfair acts or practices of Trane alleged herein, Sabbatine and the Kentucky Class were damaged.

### COUNT XIII
### North Carolina U.C.C. Breach of Express Warranty
### N.C.G.S. § 25-2-313
### (On Behalf of the North Carolina Class)

215.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

216.     Rainey brings this claim on behalf of herself and the North Carolina Class.

217.     As an express warrantor, manufacturer and merchant, Trane has certain obligations under N.C.G.S. § 25-2-313 to conform its HVAC systems to the express warranties.

46

218.     When Rainey and the members of the North Carolina Class purchased their HVAC systems, Trane expressly provided a "warranty against manufacturing defects," with no exclusion for oil.

219.     The defect at issue in this litigation was present at the time the HVAC systems were sold to Rainey and the members of the North Carolina Class.

220.     Trane breached its express warranties (and continues to breach these express warranties) because it did not (and has not) corrected the defect with its HVAC systems.

221.     Although Trane was obligated to correct the defect with its HVAC systems, none of the purported, attempted fixes are adequate under the express warranty, as they did not cure the defect.

222.     Trane has failed to conform its HVAC systems to the express warranties, and, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

223.     Rainey and the members of the North Carolina Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Trane or by operation of law in light of Trane's conduct as described throughout this Complaint.

224.     Trane received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, Trane has failed and refused to offer an effective remedy.

225.     In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Trane to limit its express warranties in a manner that would exclude or limit coverage for the manufacturing defect in its HVAC systems would be unconscionable. Trane's warranties were adhesive, and did not permit negotiation, or the inclusion of

manufacturing defects. Trane possessed superior knowledge of the defective manufacturing prior to offering the HVAC systems for sale. Trane concealed and did not disclose this defect, and Trane did not remedy the defect prior to sale (or afterward). Any effort to otherwise limit liability for the design defect is null and void.

226.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Trane to limit its express warranties in a manner that would result in limiting remedies to the exclusion of labor and other expenses incurred in repairing or replacing the defective products are unconscionable, fail to conform to the requirements for limiting remedies under applicable law, and cause Trane's express warranties to fail of their essential purpose, and are therefore void.

227.    Rainey and the members of the North Carolina Class have suffered damages caused by Trane's breach of its express warranties and are entitled to recover damages, including, but not limited to, diminution of value.

**COUNT XIV**
**North Carolina U.C.C. Breach of Implied Warranty**
**N.C.G.S. § 25-2-314**
**(On Behalf of the North Carolina Class)**

228.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

229.    Rainey brings this claim on behalf of herself and the North Carolina Class.

230.    Trane is and was at all relevant times a merchant with respect to the HVAC systems. Trane directly sold and marketed its HVAC systems to Rainey and the North Carolina Class through Trane's dealers, for the intended purpose of installing those HVAC systems in homes for consumer use. Trane knew that its HVAC systems would and did pass unchanged from itself to Rainey and the North Carolina Class.

231.    A warranty that the HVAC systems were in merchantable quality and condition is implied by law pursuant to N.C. Gen. Stat. § 25-2-314.

232.    Trane implicitly warranted that the HVAC systems were of good and merchantable condition and quality – fit and safe for their ordinary intended use; and namely, to provide heating and cooling in homes.

233.    The HVAC systems were defective at the time they left the possession of Trane, and the manufacturing process was defective as described herein.  Trane knew of this defect at the time these transactions occurred.  Thus, the HVAC systems, when sold and at all times thereafter, were not in merchantable condition or quality and were not fit for their ordinary intended purpose.

234.    By virtue of the conduct described herein and throughout this Complaint, Trane breached the implied warranty of merchantability.

235.    Rainey and the North Carolina Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Trane or by operation of law in light of Trane's unconscionable conduct.

236.    Trane received timely notice regarding the problems at issue in this litigation, both through presentations of Rainey's HVAC systems to Trane for warranty repair work and through legal proceedings against Trane.  Notwithstanding such notice, Trane has failed and refused to offer an effective remedy.

237.    Rainey and the North Carolina Class have had sufficient dealings with either Trane or its agents to establish privity of contract.  Notwithstanding this, privity is not required in this case because Rainey and the members of the North Carolina Class are intended third-party beneficiaries of contracts between Trane and its dealers; specifically, they are intended

beneficiaries of Trane's implied warranties. The dealers were not intended to be the ultimate consumers of the HVAC systems and have no rights under the warranty agreements provided with the HVAC systems. The warranty agreements were designed for and intended to benefit the ultimate consumers only.

238.    As a direct and proximate result of Trane's breach of the implied warranty of merchantability, Rainey and the North Carolina Class members were caused to suffer economic damage, including loss attributable to the diminished value of their homes and HVAC systems, as well as the monies spent and to be spent to repair and/or replace their HVAC systems.

## COUNT XV
### Pennsylvania U.C.C. Breach of Express Warranty
### 13 Pa. Stat. § 2313
### (On Behalf of the Pennsylvania Class)

239.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

240.    Plaintiff Smith brings this claim on behalf of himself and the Pennsylvania Class.

241.    As an express warrantor, manufacturer and merchant, Trane has certain obligations under 13 Pa. Cons. Stat. § 2313 to conform its HVAC systems to the express warranties.

242.    When Smith and the members of the Pennsylvania Class purchased their HVAC systems, Trane expressly provided a "warranty against manufacturing defects," with no exclusion for oil.

243.    The defect at issue in this litigation was present at the time the HVAC systems were sold to Smith and the members of the Pennsylvania Class.

244.    Trane breached its express warranties (and continues to breach these express warranties) because it did not (and has not) corrected the defect with its HVAC systems.

245.    Although Trane was obligated to correct the defect with its HVAC systems, none of the purported, attempted fixes are adequate under the express warranty, as they did not cure the defect.

246.    Trane has failed to conform its HVAC systems to the express warranties, and, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

247.    Smith and the members of the Pennsylvania Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Trane or by operation of law in light of Trane's conduct as described throughout this Complaint.

248.    Trane received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, it has failed and refused to offer an effective remedy.

249.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Trane to limit its express warranties in a manner that would exclude or limit coverage for the manufacturing defect in its HVAC systems would be unconscionable. Trane's warranties were adhesive, and did not permit negotiation, or the inclusion of manufacturing defects.  Trane possessed superior knowledge of the defective manufacturing prior to offering the HVAC systems for sale.  Trane concealed and did not disclose this defect, and Trane did not remedy the defect prior to sale (or afterward).  Any effort to otherwise limit liability for the manufacturing defect is null and void.

250.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Trane to limit its express warranties in a manner that would result in limiting remedies to the exclusion of labor and other expenses incurred in repairing or replacing

the defective products are unconscionable, fail to conform to the requirements for limiting remedies under applicable law, and cause Trane's express warranties to fail of their essential purpose, and are therefore void.

251.    Smith and the members of the Pennsylvania Class have suffered damages caused by Trane's breach of its express warranties and are entitled to recover damages, including, but not limited to, diminution of value.

### COUNT XVI
### Pennsylvania U.C.C. Breach of Implied Warranty
### 13 Pa. Stat. § 2314
### (On Behalf of the Pennsylvania Class)

252.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

253.    Smith brings this claim on behalf of himself and the Pennsylvania Class.

254.    Trane is and was at all relevant times a merchant with respect to the HVAC systems. Trane directly sold and marketed its HVAC systems to Smith and the Pennsylvania Class through Trane's dealers, for the intended purpose of installing those HVAC systems in homes for consumer use.  Trane knew that its HVAC systems would and did pass unchanged from itself to Smith and the Pennsylvania Class.

255.    A warranty that the HVAC systems were in merchantable quality and condition is implied by law pursuant to 13 Pa. Stat. § 2314.

256.    Trane implicitly warranted that the HVAC systems were of good and merchantable condition and quality – fit and safe for their ordinary intended use; namely, to provide heating and cooling in homes.

257.     The HVAC systems were defective at the time they left the possession of Trane, and the manufacturing process was defective as described herein.  Trane knew of this defect at the time these transactions occurred.  Thus, the HVAC systems, when sold and at all times thereafter, were not in merchantable condition or quality and were not fit for their ordinary intended purpose.

258.     By virtue of the conduct described herein and throughout this Complaint, Trane breached the implied warranty of merchantability.

259.     Smith and the members of the Pennsylvania Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Trane or by operation of law in light of Trane's unconscionable conduct.

260.     Trane received timely notice regarding the problems at issue in this litigation, both through presentations of Smith's HVAC systems to Trane for warranty repair work and through legal proceedings against Trane.  Notwithstanding such notice, Trane has failed and refused to offer an effective remedy.

261.     Smith and the Pennsylvania Class have had sufficient dealings with either Trane or its agents to establish privity of contract.  Notwithstanding this, privity is not required in this case because Smith and the members of the Pennsylvania Class are intended third-party beneficiaries of contracts between Trane and its dealers; specifically, they are intended beneficiaries of Trane's implied warranties. The dealers were not intended to be the ultimate consumers of the HVAC systems and have no rights under the warranty agreements provided with the HVAC systems.  The warranty agreements were designed for and intended to benefit the ultimate consumers only.

262.    As a direct and proximate result of Trane's breach of the implied warranty of merchantability, Smith and the Pennsylvania Class members were caused to suffer economic damage, including loss attributable to the diminished value of their homes and HVAC systems, as well as the monies spent and to be spent to repair and/or replace their HVAC systems.

## COUNT XVII
### Wisconsin U.C.C. Breach of Express Warranty
### Wis. Stat. § 402.313
### (On Behalf of the Wisconsin Class)

263.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

264.    Plaintiff Livingston brings this claim on behalf of herself and the Wisconsin Class.

265.    As an express warrantor, manufacturer and merchant, Trane has certain obligations under Wis. Stat. § 402.313 to conform its HVAC systems to the express warranties.

266.    When Livingston and the members of the Wisconsin Class purchased their HVAC systems, Trane expressly provided a "warranty against manufacturing defects," with no exclusion for oil.

267.    The defect at issue in this litigation was present at the time the HVAC systems were sold to Livingston and the members of the Wisconsin Class.

268.    Trane breached its express warranties (and continues to breach these express warranties) because it did not (and has not) corrected the defect with its HVAC systems.

269.    Although Trane was obligated to correct the defect with its HVAC systems, none of the purported, attempted fixes are adequate under the express warranty, as they did not cure the defect.

270.    Trane has failed to conform its HVAC systems to the express warranties, and, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

271.    Livingston and the members of the Wisconsin Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Trane or by operation of law in light of Trane's conduct as described throughout this Complaint.

272.    Trane received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, Trane has failed and refused to offer an effective remedy.

273.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Trane to limit its express warranties in a manner that would exclude or limit coverage for the manufacturing defect in its HVAC systems would be unconscionable. Trane's warranties were adhesive, and did not permit negotiation, or the inclusion of manufacturing defects.  Trane possessed superior knowledge of the defective manufacturing prior to offering the HVAC systems for sale.  Trane concealed and did not disclose this defect, and did not remedy the defect prior to sale (or afterward).  Any effort to otherwise limit liability for the manufacturing defect is null and void.

274.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Trane to limit its express warranties in a manner that would result in limiting remedies to the exclusion of labor and other expenses incurred in repairing or replacing the defective products are unconscionable, fail to conform to the requirements for limiting remedies under applicable law, and cause Trane's express warranties to fail of their essential purpose, and are therefore void.

275.    Livingston and the members of the Wisconsin Class have suffered damages caused by Trane's breach of its express warranties and are entitled to recover damages, including, but not limited to, diminution of value.

## COUNT XVIII
**Wisconsin Breach of Implied Warranty**
**Wis. Stat. § 402.314**
**(On Behalf of the Wisconsin Class)**

276.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

277.    Livingston brings this claim on behalf of herself and the Wisconsin Class.

278.    Trane is and was at all relevant times a merchant with respect to the HVAC systems. Trane directly sold and marketed its HVAC systems to Plaintiff and the Wisconsin Class through Trane's dealers, for the intended purpose of installing those HVAC systems in homes for consumer use.  Trane knew that its HVAC systems would and did pass unchanged from itself to Livingston and the Wisconsin Class.

279.    A warranty that the HVAC systems were in merchantable quality and condition is implied by law pursuant to Wis. Stat. § 402.314.

280.    Trane implicitly warranted that the HVAC systems were of good and merchantable condition and quality – fit and safe for their ordinary intended use; namely, to provide heating and cooling in homes.

281.    The HVAC systems were defective at the time they left the possession of Trane, and the manufacturing process was defective as described herein.  Trane knew of this defect at the time these transactions occurred.  Thus, the HVAC systems, when sold and at all times

thereafter, were not in merchantable condition or quality and were not fit for their ordinary intended purpose.

282.    By virtue of the conduct described herein and throughout this Complaint, Trane breached the implied warranty of merchantability.

283.    Livingston and the members of the Wisconsin Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Trane or by operation of law in light of Trane's unconscionable conduct.

284.    Trane received timely notice regarding the problems at issue in this litigation, both through presentations of Livingston's HVAC system to Trane for warranty repair work and through legal proceedings against Trane.  Notwithstanding such notice, Trane has failed and refused to offer an effective remedy.

285.    Livingston and the Wisconsin Class have had sufficient dealings with either Trane or its agents to establish privity of contract. Notwithstanding this, privity is not required in this case because Livingston and the members of the Wisconsin Class are intended third-party beneficiaries of contracts between Trane and its dealers; specifically, they are intended beneficiaries of Trane's implied warranties. The dealers were not intended to be the ultimate consumers of the HVAC systems and have no rights under the warranty agreements provided with the HVAC systems.  The warranty agreements were designed for and intended to benefit the ultimate consumers only.

286.    As a direct and proximate result of Trane's breach of the implied warranty of merchantability, Livingston and the Wisconsin Class members were caused to suffer economic

damage, including loss attributable to the diminished value of their homes and HVAC systems, as well as the monies spent and to be spent to repair and/or replace their HVAC systems.

**COUNT XIX**
**Illinois U.C.C. Breach of Express Warranty**
**810 Il.C.S. § 5/2-313**
**(On Behalf of the Illinois Class)**

287.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

288.     Colbert brings this claim on behalf of himself and the Illinois Class.

289.     As an express warrantor and manufacturer and merchant, Trane has certain obligations under Illinois Consolidated Statute section 5/2-313 to conform its HVAC systems to the express warranties.

290.     When Colbert and the members of the Illinois Class purchased their HVAC systems, Trane expressly provided a "warranty against manufacturing defects," with no exclusion for oil.

291.     The defect at issue in this litigation was present at the time the HVAC systems were sold to Colbert and the members of the Illinois Class.

292.     Trane breached its express warranties (and continues to breach these express warranties) because it did not (and has not) corrected the defect with its HVAC systems.

293.     Although Trane was obligated to correct the defect with its HVAC systems, none of the purported, attempted fixes are adequate under the express warranty, as they did not cure the defect.

294.     Trane has failed to conform its HVAC systems to the express warranties, and, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

58

295.    Colbert and the members of the Illinois Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Trane or by operation of law in light of its conduct as described throughout this Complaint.

296.    Trane received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, Trane has failed and refused to offer an effective remedy.

297.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Trane to limit its express warranties in a manner that would exclude or limit coverage for the manufacturing defect in its HVAC systems would be unconscionable. Trane's warranties were adhesive, and did not permit negotiation, or the inclusion of manufacturing defects.  Trane possessed superior knowledge of the defective manufacturing prior to offering the HVAC systems for sale.  Trane concealed and did not disclose this defect, and Trane did not remedy the defect prior to sale (or afterward).  Any effort to otherwise limit liability for the manufacturing defect is null and void.

298.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Trane to limit its express warranties in a manner that would result in limiting remedies to the exclusion of labor and other expenses incurred in repairing or replacing the defective products are unconscionable, fail to conform to the requirements for limiting remedies under applicable law, and cause Trane's express warranties to fail of their essential purpose, and are therefore void.

299.    Colbert and the members of the Illinois Class have suffered damages caused by Trane's breach of its express warranties and are entitled to recover damages, including, but not limited to, diminution of value.

## COUNT XX
### Illinois Breach of Implied Warranty
### 810 Il.C.S. § 5/2-314
### (On Behalf of the Illinois Class)

300.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

301.    Colbert brings this claim on behalf of himself and the Illinois Class.

302.    Trane is and was at all relevant times a merchant with respect to the HVAC systems.  Trane directly sold and marketed its HVAC systems to Colbert and the Illinois Class through Trane's dealers, for the intended purpose of installing those HVAC systems in homes for consumer use.  Trane knew that its HVAC systems would and did pass unchanged from itself to Colbert and the Illinois Class.

303.    A warranty that the HVAC systems were in merchantable quality and condition is implied by law pursuant to Illinois Stat. § 5/2-314.

304.    Trane implicitly warranted that the HVAC systems were of good and merchantable condition and quality – fit and safe for their ordinary intended use; namely, to provide heating and cooling in homes.

305.    The HVAC systems were defective at the time they left the possession of Trane, and the manufacturing process was defective as described herein.  Trane knew of this defect at the time these transactions occurred.  Thus, the HVAC systems, when sold and at all times thereafter, were not in merchantable condition or quality and were not fit for their ordinary intended purpose.

306.    By virtue of the conduct described herein and throughout this Complaint, Trane breached the implied warranty of merchantability.

307.    Colbert and the members of the Illinois Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Trane or by operation of law in light of Trane's unconscionable conduct.

308.    Trane received timely notice regarding the problems at issue in this litigation, both through presentations of Colbert's HVAC systems to Trane for warranty repair work and through legal proceedings against Trane.  Notwithstanding such notice, Trane has failed and refused to offer an effective remedy.

309.    Colbert and the Illinois Class have had sufficient dealings with either Trane or its agents to establish privity of contract.  Notwithstanding this, privity is not required in this case because Colbert and the members of the Illinois Class are the intended third-party beneficiaries of contracts between Trane and its dealers; specifically, they are intended beneficiaries of Trane's implied warranties.  The dealers were not intended to be the ultimate consumers of the HVAC systems and have no rights under the warranty agreements provided with the HVAC systems. The warranty agreements were designed for and intended to benefit the ultimate consumers only.

310.    As a direct and proximate result of Trane's breach of the implied warranty of merchantability, Colbert and the Illinois Class members were caused to suffer economic damage, including loss attributable to the diminished value of their homes and HVAC systems, as well as the monies spent and to be spent to repair and/or replace their HVAC systems.

**COUNT XXI**
**Kentucky U.C.C. Breach of Express Warranty**
**KRS § 355.2-313**
**(On Behalf of the Kentucky Class)**

311.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

312.    Sabbatine brings this claim on behalf of himself and the Kentucky Class.

313.    As an express warrantor and manufacturer and merchant, Trane has certain obligations under Kentucky Revised Statutes § 355.2-313 to conform its HVAC systems to the express warranties.

314.    When Plaintiff Sabbatine and the members of the Kentucky Class purchased their HVAC systems, Trane expressly provided a "warranty against manufacturing defects," with no exclusion for oil.

315.    The defect at issue in this litigation was present at the time the HVAC systems were sold to Sabbatine and the members of the Kentucky Class.

316.    Trane breached its express warranties (and continues to breach these express warranties) because it did not (and has not) corrected the defect with its HVAC systems.

317.    Although Trane was obligated to correct the defect with its HVAC systems, none of the purported, attempted fixes are adequate under the express warranty, as they did not cure the defect.

318.    Trane has failed to conform its HVAC systems to the express warranties, and, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

319.    Sabbatine and the members of the Kentucky Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Trane or by operation of law in light of Trane's conduct as described throughout this Complaint.

320.    Trane received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, Trane has failed and refused to offer an effective remedy.

321.     In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Trane to limit its express warranties in a manner that would exclude or limit coverage for the manufacturing defect in its HVAC systems would be unconscionable. Trane's warranties were adhesive, and did not permit negotiation, or the inclusion of manufacturing defects.  Trane possessed superior knowledge of the defective manufacturing prior to offering the HVAC systems for sale.  Trane concealed and did not disclose this defect, and Trane did not remedy the defect prior to sale (or afterward).  Any effort to otherwise limit liability for the manufacturing defect is null and void.

322.     In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Trane to limit its express warranties in a manner that would result in limiting remedies to the exclusion of labor and other expenses incurred in repairing or replacing the defective products are unconscionable, fail to conform to the requirements for limiting remedies under applicable law, cause Trane's express warranties to fail of their essential purpose, and are therefore void.

323.     Sabbatine and the members of the Kentucky Class have suffered damages caused by Trane's breach of its express warranties and are entitled to recover damages, including, but not limited to, diminution of value.

**<u>COUNT XXII</u>**
**Kentucky Breach of Implied Warranty**
**KRS § 355.2-314**
**(On Behalf of the Kentucky Class)**

324.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

325.     Sabbatine brings this claim on behalf of himself and the Kentucky Class.

63

326.     Trane is and was at all relevant times a merchant with respect to the HVAC systems. Trane directly sold and marketed its HVAC systems to Sabbatine and the Kentucky Class through Trane's dealers, for the intended purpose of installing those HVAC systems in homes for consumer use.  Trane knew that its HVAC systems would and did pass unchanged from itself to Sabbatine and the Kentucky Class.

327.     A warranty that the HVAC systems were in merchantable quality and condition is implied by law pursuant to KRS § 355.2-314.

328.     Trane implicitly warranted that the HVAC systems were of good and merchantable condition and quality – fit and safe for their ordinary intended use; namely, to provide heating and cooling in homes.

329.     The HVAC systems were defective at the time they left the possession of Trane, and the manufacturing process was defective as described herein.  Trane knew of this defect at the time these transactions occurred.  Thus, the HVAC systems, when sold and at all times thereafter, were not in merchantable condition or quality and were not fit for their ordinary intended purpose.

330.     By virtue of the conduct described herein and throughout this Complaint, Trane breached the implied warranty of merchantability.

331.     Sabbatine and the members of the Kentucky Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Trane or by operation of law in light of Trane's unconscionable conduct.

332.     Trane received timely notice regarding the problems at issue in this litigation, both through presentations of Sabbatine's HVAC system to Trane for warranty repair work and

through legal proceedings against Trane.  Notwithstanding such notice, Trane has failed and refused to offer an effective remedy.

333.    Sabbatine and the Kentucky Class have had sufficient dealings with either Trane or its agents to establish privity of contract.  Notwithstanding this, privity is not required in this case because Sabbatine and the members of the Kentucky Class are intended third-party beneficiaries of contracts between Trane and its dealers; specifically, they are intended beneficiaries of Trane's implied warranties. The dealers were not intended to be the ultimate consumers of the HVAC systems and have no rights under the warranty agreements provided with the HVAC systems.  The warranty agreements were designed for and intended to benefit the ultimate consumers only.

334.    As a direct and proximate result of Trane's breach of the implied warranty of merchantability, Sabbatine and the Kentucky Class members were caused to suffer economic damage, including loss attributable to the diminished value of their homes and HVAC systems, as well as the monies spent and to be spent to repair and/or replace their HVAC systems.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Plaintiffs as Class  representatives under Federal Rule of Civil Procedure 23 and Plaintiffs' counsel  as Class Counsel;

(b)    Ordering injunctive relief;

(c)    Awarding all actual, general, special, incidental, statutory, treble or multiple, punitive and consequential damages to which Plaintiffs and Class members are entitled;

(d)    Awarding pre-judgment and post-judgment interest on such monetary relief;

(e)    Awarding restitution in an amount according to proof;

(f)    Awarding Plaintiffs and Class members their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(g)    Such other and further relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Plaintiffs hereby demand a trial by jury.

Dated:  August 28, 2017                    Respectfully submitted,

By:    */s/ James C. Shah*
       James C. Shah
       Natalie Finkelman Bennett
       SHEPHERD, FINKELMAN, MILLER
       & SHAH, LLP
       475 White Horse Pike
       Collingswood, NJ 08107-1909
       Telephone: (856) 858-1770
       Facsimile: (866) 300-7367
       jshah@sfmslaw.com
       nfinekelman@sfmslaw.com

       Timothy N. Mathews
       Christina Donato Saler
       **CHIMICLES & TIKELLIS LLP**
       One Haverford Centre
       361 West Lancaster Avenue
       Haverford, PA 19041
       Telephone: (610) 642-8500
       Facsimile (610) 649-3633
       tnm@chimicles.com
       cds@chimicles.com

       *Counsel for Plaintiffs and Proposed Lead Class Counsel*